### The town of CHATHAM *against* BRAINERD and another.

In trespass *quare clausum fregit*, title in the plaintiff, or possession, is essential to a recovery; and the defendant may either avail himself of any insufficiency in the plaintiff's proof, or may show title and possession in another, by way of defence.

The proprietors of land adjoining a highway, have, *prima facie* at least, a fee in such highway, *ad medium filum viae*, subject to the easement.

If in a deed the land conveyed be described by courses and distances, beginning at a certain point and returning to that point, and also as bounded on one side by a highway, the latter description, as far as it extends, will controul the former.

Where the land conveyed was described as bounded " *East* on highway or common land ;" and it appeared that there was a highway there; it was held, that the words, " or common land" did not vary the construction.

In *January*, 1712, the town of *M.*, comprising territory on both sides of *Connecticut* river, in town meeting, granted to the inhabitants on the *East* side of the river one acre of land (describing it) for a burying place, and appointed a committee to lay it out. At the time of this grant, those inhabitants had formed themselves, by voluntary association, into an ecclesiastical society, and were incorporated as such, two years afterwards. The society immediately entered into possession of the land, and have ever since occupied it as a burying ground. Held, 1. that the grant thus made, was as effectual as though it had been made in proprietors' meeting ; being confirmed by the statute of 1723 ; 2. that this being a grant for pious and charitable uses, it was not void because the society was not incorporated until after it was made ; for the grant looked to a future grantee, in whom the fee was to vest, and became operative upon the incorporation of the society and their going into possession ; 3. that this was not the grant of an easement, but of the land itself for the purpose specified ; 4. that consequently, no right remained in the original proprietors after such grant, and a subsequent grantee could acquire none from them.

THIS was an action of trespass *quare clausum fregit ;* to which the general issue was pleaded, with notice—1. of the statute of limitations ; 2. a license from the plaintiffs ; 3. a li-

cence from the town of *Middletown*, alleged to be tenants in common with the plaintiffs of the *locus in quo ;* 4. that by the votes of the proprietors of the common and undivided lands of *Middletown* and *Chatham*, passed in 1786, 1812, 1822, and at other meetings, the defendants, as inhabitants of *Chatham*, had a right to enter and do the acts complained of, on the *locus in quo*.

The cause was tried at *Middletown, February* term, 1835, before *Williams*, Ch. J.

On the trial, the plaintiffs, for the purpose of proving title to the *locus in quo*, adduced the following evidence.

The record of a patent from the colony of *Connecticut* to the ancient town of *Middletown*, in the usual form, dated the 11th of *March*, 1685–6, and recorded in the town records of *Middletown*.

A copy of certain votes of the proprietors of the common and undivided lands in the ancient town of *Middletown*, (of which the town of *Chatham* was a part until 1767) passed at a legal meeting of the proprietors, held at *Middletown*, on the 9th of *January*, 1786, and recorded in the public records of lands in the town of *Chatham*, in *February*, 1835 ; which copy was certified by the town clerk of *Chatham*, and also by the clerk of the proprietors. These votes were as follows : "At a meeting of the proprietors of the common and undivided lands of *Middletown* and *Chatham*, in *Middletown*, this 9th day of *January*, 1786, by adjournment from the 15th day of *December*, 1785. *Voted*, that what remains undivided of the two quarries in *Middletown* and *Chatham*, remain for the use of the inhabitants of said towns, to get stone for their own particular use, or for the general use of said towns. *Voted*, that the said proprietors do hereby quit-claim unto *Jabez Hamlin*, Esq. and the rest of the inhabitants of the town of *Middletown*, all their right, title and interest in the common and undivided lands of said *Middletown*, after satisfying the votes for the purpose of highways, or to remain as common for the general use of the inhabitants of said town. And likewise they do hereby quit-claim to *Ebenezer White*, Esq. and the rest of the inhabitants of the town of *Chatham*, all their right, title and interest in the common and undivided lands of said *Chatham*, after the aforesaid votes for the purpose of highways are answered, or to remain for the general use of the inhabitants of said town."

For the purpose of putting a construction upon these votes as

*Middlesex,*
*July, 1835.*

Chatham
*v.*
Brainerd.

to the location of the premises conveyed thereby, and to prove that such location embraced the *locus in quo,* and also for the purpose of proving title in the plaintiffs to the *locus in quo,* the plaintiffs, in connexion with the patent and votes above-mentioned, adduced in evidence a copy of the record of certain proceedings of the proprietors, at legal meetings held at *Middletown,* on the 29th of *January,* 1822, and on the 18th of *February,* 1822. At the former meeting, after reciting the votes of the 9th of *January,* 1786 ; and that at a meeting of the proprietors held on the 14th of *April,* 1812, the proprietors appointed a committee to carry into effect said grant, as they might in their discretion think proper ; and authorizing them to execute and deliver such deeds as might be necessary for the purpose, in the name and behalf of the proprietors ; and that said committee had not executed their trust, one of them having died and another having removed out of the state ; and that the proprietors are desirous, that the right and interest, which they had, at the time of passing said votes, or now have, in or to the quarries in the towns of *Middletown* and *Chatham,* should be transferred to and vested in said towns and the inhabitants thereof, respectively— it was, on motion, " *Voted and agreed,* that the acts of said proprietors, as expressed in the votes herein-before-mentioned, be, and they are hereby, approved, ratified and confirmed ; and that all the estate, right, title and interest, which the proprietors of the common and undivided lands in said towns of *Middletown* and *Chatham* had, on said 9th day of *January,* 1786, or at any time since have had, or now have or ought to have, in or to the aforesaid quarries, or to either or any of them, and which has not been before fully and lawfully conveyed and transferred, be, and the same hereby is, transferred to and vested equally in said towns of *Middletown* and *Chatham,* and in the inhabitants thereof respectively ; that is to say, the one moiety to be and belong to said town of *Middletown* and the inhabitants thereof, and the other moiety to be and belong to said town of *Chatham* and the inhabitants thereof, to be by said towns owned and occupied, possessed, improved and enjoyed, in as full and ample a manner as they have at any time been owned, occupied, possessed, improved and enjoyed, by said proprietors. And that *Joshua Stow* of said *Middletown* and *Seth Overton* of *Chatham* be, and they hereby are, authorized, empowered and requested to execute and deliver to the town-clerks in said towns respectively a conveyance of such right,

*Middlesex,*
*July, 1835.*

Chatham
*v.*
Brainerd.

estate and interest, for the use and benefit of said towns respectively, to be by them and their successors, heirs and assigns, owned and held in fee-simple."

At the meeting held on the 18th day of *February*, after reciting a deed from the proprietors to the towns of *Middletown* and *Chatham*, dated the 2nd of *February*, 1822, it was " *Voted and declared*, that this meeting approve, ratify and confirm said deed and the transfer and conveyance therein purporting to be made." And after reciting the votes of the 9th of *January*, 1786, and that the proprietors, at a meeting held *April* 14th, 1812, ratified and approved of said votes, releases and quit-claims, and appointed a committee to carry said votes into full effect, and to execute such deeds or conveyances as might be necessary and proper for said purpose, and that one of said committee had since died and another removed out of the state, and that the concurrence of a majority of said committee in executing said deeds and conveyances, cannot be obtained ; and that said proprietors are desirous, that said votes, releases and quit-claims should be carried into full and complete effect, according to the intentions of said proprietors, as therein expressed ; and that all the estate and interest of said proprietors, at the time of passing said votes of the 9th of *January*, 1786, (except their interest in the quarries since transferred, as on record) should be transferred to and vested in the towns of *Middletown* and *Chatham*, according to the provisions of a certain statute in such case made and provided ; it was " *Voted, agreed and declared*, that this meeting do approve, ratify and confirm each of the votes, releases and quit-claims herein-before-mentioned ; and that *Joshua Stow* and *Seth Overton* be, and they hereby are, appointed, authorized and fully empowered, in the name and for and in behalf of said proprietors, to execute and deliver to the town-clerk of the town of *Middletown*, for the use and benefit of the inhabitants of said town of *Middletown*, a deed, legally executed and acknowledged, which shall transfer to and vest in said town of *Middletown*, and the inhabitants thereof, all such estate, right, title and interest as said proprietors had, at the time of passing said votes, on the 9th day of *January*, 1786, or at any time since have had, or now have, or ought to have, in or to any and all common and undivided lands, situate, lying and being in said town of *Middletown*, however bounded or described, to the sole use,

Middlesex,
July, 1835.

Chatham
v.
Brainerd.

benefit and behoof of said town and inhabitants, and to their successors, heirs and assigns forever : Also, in like manner, to execute and deliver to the town-clerk of said town of *Chatham*, for the use and benefit of the inhabitants thereof, a deed legally executed and acknowledged, which shall transfer to and vest in said town of *Chatham* and the inhabitants thereof, all such estate, right, title and interest as said proprietors had, at the time of passing said votes on the 9th day of *January*, 1786, or at any time since have had, or now have, or ought to have, in or to any and all common and undivided land, situate, lying and being in said town of *Chatham*, however bounded or described, to the sole use, benefit and behoof of said town and inhabitants, and to their successors, heirs and assigns forever : Provided, that the quarries in said towns of *Middletown* and *Chatham* having been already transferred to said towns, shall be exempted from the deed to be executed as aforesaid."

At the same meeting, after reciting two deeds, dated the 18th of *February*, 1822, from the proprietors to the towns of *Middletown* and *Chatham* severally, it was, as to each of said deeds, on motion, " *Voted and declared*, that this meeting approve, ratify and confirm said deeds, and the transfer and conveyance therein purporting to be made."

The deed first above referred to, after reciting the proceedings of the proprietors of the 9th of *January*, 1786, on the 14th of *April*, 1812, and on the 29th of *January*, 1822, granted, released, assigned, transferred and conveyed to the towns of *Middletown* and *Chatham* jointly, all the estate and interest of the proprietors in two tracts of land, one in *Middletown* and the other in *Chatham*. The description in the deed of the land in *Chatham*, is as follows : " Containing in quantity two acres and thirteen rods, (be the same more or less) and is bounded *Easterly* on highway ; *Northerly* on *Shaler* and *Hall's* quarry, (so called) or land reported to belong to *Joel Hall* and others ; *Westerly* on *Connecticut* river ; *Southerly* on *Brainerd's* quarry, (so called) or land of *Erastus Brainerd* and others ; the courses and distances being nearly as follows—the *Easterly* line *N.* 26° 45′ *E.* eighteen rods, one link ; the *South* 87° *E.* about twenty-two rods and two links ; the *West* line, as the river runs, being *S.* 33° 45′ *W.*, about eighteen and a quarter rods ; the *North* line about *N.* 89° 56′ *W.* about twenty rods. The *North* and *South* lines exceed the above distan

ces about one rod each, by reason of stone and earth which have been drawn into the river beyond the original low-water mark."

The two other deeds, dated the 18th of *February*, 1822, from the proprietors, one to the town of *Middletown*, the other to the town of *Chatham*, after reciting the proceedings of the proprietors on the 9th of *January*, 1786, on the 14th of *April*, 1812, and on the 29th of *January*, 1822, granted, released, assigned, transferred and conveyed to each town all the estate and interest of the proprietors in all and any tracts of land lying in that town, however bounded or described, referring to the town records for a more particular description.

At a town meeting of the town of *Chatham*, held on the 4th of *February*, 1822, the deed of the 2nd of *February*, 1822, was, *by vote*, approved and accepted, and ordered to be recorded in *Chatham* town records, as soon as recorded in *Middletown* and delivered for that purpose. And at a town meeting of the town of *Chatham*, held on the 18th of *March*, 1822, it was *voted* to accept said deed from the proprietors to that town, dated the 18th of *February*, 1822, and it was ordered to be recorded. At town meetings of the town of *Middletown*, held on the first *Monday* of *February*, 1822, and on the 18th of *March*, 1822, the deed to *Middletown* and *Chatham*, and that to *Middletown*, were assented to, approved and accepted, and ordered to be recorded in the town records.

At the session of the General Assembly of this state, held in *May*, 1822, after reciting the same deeds, it was " *Resolved by this Assembly*, that such deeds and conveyances be, and the same are hereby declared to be valid and effectual for the uses and purposes therein mentioned ; and that said deed, dated *February* 2nd, 1822, is, and shall be deemed and taken to vest in the said towns of *Middletown* and *Chatham* jointly, in manner therein described, all the right, estate, title and interest, which said proprietors had, on the 9th day of *January*, 1786, or at any time since have had, in or to the quarries, or tracts of land supposed to contain quarries of free-stone therein described ; and that said towns respectively be, and they hereby are, fully authorized and empowered, in legal town meeting, by vote of a majority, to manage, regulate, and dispose of their respective interests in said quarries, and in said common and undivided lands, in such manner as said towns or other corporations may

by law manage, regulate and dispose of their interest in real estate."

It was admitted, by the parties, that the land lying immediately *West* of the *locus in quo* and adjoining thereto, was owned, partly by the towns of *Middletown* and *Chatham*, as tenants in common, and partly by the defendants and *Joel Hall* and others.

The defendants offered evidence to prove, and claimed to have proved, that for more than sixty years last past, there had been an open, common, public highway for all persons to go, pass and repass at pleasure, in a *Northerly* and *Southerly* direction, over and across that part of the *locus in quo,* which is contiguous to the land of the towns of *Middletown* and *Chatham,* and to that of the defendants, *Joel Hall* and others. But the defendants offered no other evidence of the existence of such highway than the fact that it had been, for such period, commonly used as such, and had been repaired as such, and mentioned as such in the conveyances of the adjoining land ; and houses and other buildings had been erected thereon, as on the public streets.

The defendants also, for the purpose of proving title in themselves to the soil of the highway adjoining and opposite to the land of the defendants, *Joel Hall* ond others, to the centre of said highway, on the *West* side thereof, adduced in evidence sundry deeds and conveyances of such land, marked F in the motion.

The first was a deed from the proprietors to *Benjamin Sutliff,* dated *August* 8th, 1785, conveying one piece of quarry land lying in *Chatham,* containing one acre and one hundred rods, beginning four rods *Westward* of the *South-west* corner of *Noah Smith's Goodale* lot; from thence running *West* 26° *South,* four rods ; then *West* 3° *North,* fifteen and a half rods, to the river at high-water mark ; then *North* 20° *East,* six and a half rods ; then *East* 3° *South,* twenty rods ; then *South* 26° *West,* fourteen and three quarters rods, to the first station ; bounded *Westerly,* on river ; *Northerly,* on common land ; *Easterly, on highway or common land ; Southerly,* partly on land formerly granted to *Henry Goodale* for warehouseplat, and partly on common land, left for highway and for the use of the building yard adjoining. The next was a deed from *Benjamin Sutliff* to *Thomas Lyman, Abel Ly-*

*man* and *Noah Talcott*, dated *December* 30th, 1788, conveying two pieces of land, one of which is described in the words of said deed from the proprietors to *Benjamin Sutliff*, and the other, as land formerly granted to *Henry Goodale*, for warehouse plat, containing four rods, bounded *North*, on land above described ; *East* and *South, on common land or highway ;* and, *West*, on the river. Then followed a deed from *Noah Talcott*, to *William Crosby*, dated *January* 8th, 1791, conveying one third part of one piece of quarry land, lying in *Chatham*, containing about one acre and sixty rods, bounded *Westerly*, on *Connecticut* river ; *Northerly*, on land belonging to the proprietors of *Chatham* and *Middletown ; Easterly* and *Southerly, on highway or common land,* lately known by the name of *Lyman* and *Talcott's* quarry, *Thomas* and *Abel Lyman* owning the other two thirds in quantity and value. Then a deed from *Abel Lyman* to *Hosea Roberts,* dated *October* 26th, 1795, conveying one third of both pieces of land, described and bounded in the same manner as in the former deed. Then a deed from *Thomas Lyman* to *Orange Hurlbert*, dated *February* 16th, 1796, conveying one third part of both pieces, described and bounded in the same manner. Then a deed from the administrators of *Orange Hurlbert* to *Erastus* and *Silas Brainerd,* conveying twenty-three twenty-fifth parts of two thirds of said quarry land, bounded *East on highway, &c.* Then a deed from *Jesse Hall,* as guardian, to *Erastus* and *Silas Brainerd,* dated *June* 1824, conveying two twenty fifth parts of two thirds of said quarry land, bounded *East on highway,* &c.

The defendants also claimed, that they and one *George Stanliff* were the legal owners in fee of a portion of the land adjoining said pretended highway, on the *East* side thereof, and including the whole of the *locus in quo,* except so much thereof as is contained within the limits of said highway, and so much thereof as is included within the limits of a certain piece of land called *the burying ground,* which is situated next *North* of said land of the defendants and *George Stanliff,* and is adjoining said highway on the *East* side thereof. The defendants further claimed, that they and *George Stanliff,* by virtue of said ownership, were the legal owners of the soil of the highway on the *East* side thereof to the centre.

To establish their claim of title to the said land adjoining the

highway on the *East* side thereof, and to the soil of the high-way on the *East* side thereof to the centre, the defendants produced in evidence the following documents, [marked G in the motion] accompanied with parol evidence of possession according to such documents.

*August* 10th, 1688. Land of *Richard Goodale,* jun. in *Middletown,* recorded to him and his heirs forever. One parcel of land on the *East* side of the great river, willed to him by his father, and recorded to him, by his mother's order, containing twenty acres, (more or less) abutting *on the highway East,* and on common land *West,* on highway *North,* and on *Samuel Storrs'* land *South.*

*January* 22nd, 1795. Laying out of land to *William Crosby.* Twenty nine rods of land at the *West* end of said *William Crosby's* home-lot, beginning at the *North-west* corner of said *William's* home-lot, and run *Westerly* four rods and thirteen links; then *Southerly,* eleven rods; then *Easterly,* nineteen links, to said *William's South-west* corner; abutting *East,* on said *Crosby's* land; *North,* on land left by proprietors for burying ground; *West* and *South,* on highway or common land.

Deed from *Jonas Clay* to *Henry Goodale,* dated *January* 7th, 1755, conveying a certain piece of land lying on the *East* side of *Connecticut* river in *Middletown,* in the fourth division, containing half an acre and one rood, and was laid in right of *Bethiah Wilcox,* at the *North-westerly* end of said *Goodale's* home-lot, and is enclosed by said *Goodale,* and begins at the *Western* corner of said home-lot, and runs *North-westward,* five rods and seventeen links; then *North-eastward,* thirteen rods and fourteen links, to a red-oak tree; then *South-eastward,* five rods and twenty-two links; then *South-westward,* sixteen rods to the first station.

*Ezra Bevins'* deed to *Thomas Cooper* and *Ithamar Pelton,* dated *April* 2nd, 1777; conveying four acres, three roods and twenty-seven rods of land in *Chatham,* being part of the home-lot of *Henry Goodale,* deceased, bounded *West on highway or undivided land,* &c.

*Thomas Cooper's* deed to *Noah Smith,* dated *May* 7th, 1777; conveying land in *Chatham,* being part of the home-lot of *Henry Goodale,* deceased, *viz.* the one half of four acres, three roods and twenty-seven rods of land, purchased

jointly, by the said *Thomas Cooper* and *Ithamar Pelton*; it lying at the *West* end of said lot, &c., bounded *West on highway or undivided land*, &c.

Deed from *Thomas Pelton* to *Noah Smith*, dated *June* 18th, 1777; conveying a certain piece of land lying in the first society in *Chatham*; it being part of the home-lot of *Henry Goodale*, deceased, *viz.* the half of four acres, three roods and twenty seven rods of said land, purchased jointly by the said *Thomas Cooper* and *Ithamar Pelton*; it lying at the *West* end of said lot, &c.; bounded *West on highway or undivided land*, &c.

The defendants further claimed, that as to so much of the *locus in quo* as is contained and lies within the limits of the burying ground, including that portion of the highway to the centre thereof which adjoins it, the plaintiffs had no title whatever; but that this was the property of the first eclesiastical society of *Chatham*; and to establish the title of said society, the defendants offered evidence to show, that said society was formed, by the voluntary association of the inhabitants of *Middletown* on the *East* side of *Connecticut* river, in the year 1712, and, on their application, was incorporated, in the year 1714; and in connection with such evidence, a grant from the proprietors of said town, in these words: "At a town meeting in *Middletown, January* 13th, 1712. The town, by vote, granted to the inhabitants on the *East* side of the great river one acre of that land between the land which *James Stanliff* purchased of *Richard Goodale* and the great river for a burying place: and *Ebenezer Smith, Samuel Hall* and *Joseph Warner* were chosen a committee to lay it out, where it may be most convenient and least prejudicial to out-lots." This document was accompanied with proof, that the society immediately entered into the exclusive possession of the burying ground, using it as their own from year to year, appointing a sexton and grave-digger to take care thereof and to bury therein, and have ever since used it for that purpose, and erected monuments therein, and in 1791, caused it to be fenced, and had the herbage growing thereon, and possessed it exclusively, without the interference of any one and adversely to the claim of all others, until the defendants entered into possession; and that neither the ancient proprietors, nor the town of *Middletown*, nor the town of *Chatham* have ever had any possession thereof since

the year 1712. And as to the residue of the *locus in quo, viz.* that part thereof which is adjoining and opposite to and *East* of said land of the towns of *Middletown* and *Chatham*, and lies between the *West* side or line of said highway and the centre thereof, the defendants claimed, that the towns of *Middletown* and *Chatham* were the owners in fee thereof, by virtue of the above-mentioned deed to those towns ; and that the defendants committed the acts alleged by the plaintiffs to have been done therein, by the license and permission of the town of *Chatham ;* and offered evidence to prove, and claimed to have proved, such license and permission.

The defendants also offered evidence to prove, and claimed to have proved, that at the time of the execution and delivery of said deeds to the town of *Chatham*, the burying ground was occupied, improved and claimed, by persons adversely to the proprietors of the common and undivided lands in the town of *Middletown* and to the town of *Chatham*.

The plaintiffs offered evidence to prove, and claimed to have proved, that said society had occupied and possessed said burying ground for the sole purpose of a burial place for their dead ; and had never occupied or possessed it for any other purpose whatever. The plaintiffs, therefore, claimed the law to be as follows :

1. That the legal effect of the vote of the proprietors, passed on the 9th of *January*, 1786, was, to convey to and vest in the town of *Chatham* a legal and valid title to all the lands then owned by said proprietors, lying in the town of *Chatham*, and including that part of the *locus in quo*, the title to which was then outstanding in them. But the judge, understanding the plaintiffs to rely upon the deed of 1822, and the act of Assembly, omitted altogether to charge the jury on this point, or to express any opinion thereon.

2. That the legal effect of the vote of the proprietors passed on the 9th of *January*, 1786, and of the proceedings of the proprietors and of the towns of *Middletown* and *Chatham* respectively, and of said deeds and of the resolution of the General Assembly, was, to convey to and vest in the town of *Chatham* a legal and valid title to all the lands then owned by the proprietors, and lying in that town, at the time of the execution and delivery of the deed to that town, and including that part of the *locus in quo*, the title to which was then out-standing in

the proprietors. The judge charged the jury on this point as claimed by the plaintiffs.

The defendants claimed the law to be, and requested the judge to charge the jury, as follows :

1. That if the jury should find, that any part of the land purporting to be conveyed to the town of *Chatham*, was, at the time of the execution and delivery of the deed to that town, possessed, occupied and claimed, by any person or persons, adversely to the proprietors of the common, undivided lands, in the towns of *Middletown* and *Chatham,* the deed was void as to such part, and conveyed no title to the town of *Chatham* thereto ; and that, for any acts, done by the defendants thereon, the plaintiffs could not maintain an action of trespass. The plaintiffs claimed, that such deed was not void nor inoperative, as to any part of the land purporting to be conveyed thereby, by reason of its being possessed, occupied and claimed adversely, but that such a title thereto passed, by the deed to the town of *Chatham,* that this town could not maintain the present action for acts of trespass done thereon by the defendants, notwithstanding such adverse possession. The judge charged the jury on this point, as claimed by the defendants.

2. That if the jury should find, that there was a public highway, as claimed by the defendants, the defendants and *Joel Hall* and others, by virtue of the deed from the proprietors to *Benjamin Sutliff* and the subsequent conveyances, and the defendants and *George Stanliff,* by virtue of the muniments of title to *Richard Goodale,* jr. and those claiming under him, and the towns of *Middletown* and *Chatham* as tenants in common, were, by the true construction of said deeds, conveyances and documents, the legal owners respectively of the soil of the highway adjoining and opposite to the lands of the defendants, *Joel Hall* and others, of the defendants and *George Stanliff,* and of said towns, to the centre of the highway ; and that the plaintiffs could not recover for any acts done on the soil of the highway, adjoining and opposite to said lands of the defendants and *Joel Hall* and others, or of the defendants and *George Stanliff,* nor on the soil of the highway, adjoining and opposite to said land of said towns, if the jury should find the license and permission of the town of *Chatham,* as claimed to be proved by the defendants. The plaintiffs claimed, that if the jury should find, that there was a public highway, as

claimed to be proved by the defendants, neither the defendants and *Joel Hall* and others, nor the defendants and *George Stanliff*, nor the towns of *Middletown* and *Chatham*, were, by the construction of said deeds, conveyances and documents respectively, nor any of them, the legal owners respectively of the soil of the highway, opposite and adjoining to said land to the centre of the highway, nor of any part of the highway; but that the defendants and *Joel Hall* and others, and the defendants and *George Stanliff*, and said towns, by virtue of and on the true construction of said deeds, conveyances and documents, owned only up to the line of the highway on the side of their lands respectively; and that notwithstanding said deeds, conveyances and documents, the plaintiffs had a title to the soil of the highway opposite and adjoining to their lands to the centre of the highway, and could not recover for any act of trespass proved to have been committed by the defendants thereon; and requested the judge to charge the jury accordingly. The judge charged the jury on this point as claimed by the defendants.

3. That if the jury should find, that said society had occupied the burying ground adversely to the proprietors of the common land and to the towns of *Middletown* and *Chatham*, so as to acquire a title thereto up to the *East* line of the highway, said society thereby became, *ipso facto*, the owners of the soil of the highway to the centre thereof, on the side adjoining the burying ground; and that the plaintiffs could not recover for any acts done thereon, by the defendants. The plaintiffs claimed, that by such adverse possession, the society did not, *ipso facto*, become the owners of such part of the highway, but that, notwithstanding such adverse possession, the title thereto remained in the plaintiffs, and they had a right to recover for any acts of trespass done by the defendants thereon; and requested the judge so to charge the jury. The judge charged the jury on this point, as claimed by the defendants.

4. That if the jury should find, that the society had possessed and occupied the burying ground adversely, for the period aforesaid, and had thereby acquired a right to use it as and for a burial place, and had not occupied and possessed it for any other purpose, nor with any other intent, for the like period, such possession and occupation would divest the title of the real owners as to the soil of the burying ground, and as to the soil

of the highway opposite and adjoining thereto, to the centre of the highway; and that such possession would constitute a valid and complete objection to a recovery in this suit by the plaintiffs, for any acts of the defendants committed thereon. The plaintiffs claimed, that such possession and occupation would not divest the title of the real owners to the soil of the burying ground, nor to the soil of the highway opposite and adjoining thereto, to the centre of the highway, nor any part thereof; and that such possession would constitute no objection to a recovery by the plaintiffs for any acts of trespass thereon, proved to have been done by the defendants; that the right of burial was a mere easement, and left the fee of the land in the owner, subject to be used by him for all purposes not inconsistent with the right and the exercise of the right of burial; and that such right constituted no valid objection to a recovery by the plaintiffs for the acts of trespass claimed to have been done by the defendants; and requested the judge so to charge the jury. The judge charged the jury, on this point, that if said society had used this ground exclusively, as owners, during the time and in the manner claimed by the defendants, the plaintiffs could have no title to that property. On the whole case, the judge directed the jury to return a verdict in conformity with the charge, as they should find the facts.

The jury returned a verdict for the defendants, and the plaintiffs moved for a new trial, on the ground that the judge erred in omitting to charge the jury on the first point as claimed by them, and in charging the jury on each of the other points, except the second, as claimed by the defendants.

The case was argued on all the points arising in it, at the stated term of the court in *Middlesex* county, by *W. W. Ellsworth* and *Storrs,* in support of the motion, and by *Stanley* and *R. S. Baldwin,* contra. By direction of the court, it was argued again, by the same counsel, at *Hartford,* in *November* following, on these questions: 1. Was any title acquired by the grant of 1712; and if so, what? 2. Did the possession of the burying ground, as a burying ground merely, confer a title, or was only an easement gained?

The counsel for the plaintiffs contended, 1. That the ecclesiastical society acquired no title to the land in question, by the

*Middlesex,*
*July, 1835.*

Chatham
*v.*
Brainerd.

grant of 1712. This is evident, in the first place, from the *language* of the grant, which is—" to the inhabitants on the *East* side of *Connecticut* river," and not to any religious society. If any body of men can claim to be the object of this vote, it is that body which is co-extensive with the language used, *viz. all the people.* Secondly, the *design* of the grant was, that all then living, or who should afterwards live, on the *East* side of the river, in the then town of *Middletown*, should have the use and enjoyment of this piece of land *to bury their dead in.* To confine this dedication to the *Congregationalists*, is alike contrary to the object and letter of the vote. Thirdly, the ecclesiastical society was not then in existence; nor does the vote intimate that such a society was contemplated; nor does it appear, that there was an association of any kind. The motion states, that evidence was offered to prove, that in 1712 there was a voluntary association; but this might be after the 13th of *January*, 1712. Indeed, it is quite consistent with any thing pretended on the other side, that the idea of an ecclesiastical society grew out of the vote. All that appears is, that after the vote "to *all* the people," a certain *part* of them, in 1714, for the first time, became territorially a corporation, and afterwards buried in this ground. A grant to the inhabitants of an unincoporated town, is void. *Hornbrook* v. *Westbrook*, 9 *Johns. Rep.* 73.

2. But allowing we can find the exact grantees, what is the *extent* of the grant? The vote, in terms, does not touch any portion of the highway; nor is there any evidence that there was any highway at that time. The burying ground may be dedicated, and yet the surrounding ground dedicated for a *public highway only.* Now, it is quite certain, that this vote is no grant. Without a grantee, there could be no livery of seisin; and hence no alienation. If any effect is to follow from this vote, in favour of any body, can it be claimed, that it does more than *estop* the proprietors from denying the right of the inhabitants to bury, and their practice under their right, to that extent? The land is not granted absolutely; and as such, it could not pass, nor even be dedicated; but it is only dedicated for a public purpose, *viz.* for burying. Even a grant of land for a specific purpose excludes every other purpose; but a dedication to operate by way of estoppel, cannot be broader than the object named in the instrument. This would leave the fee

in the proprietors subject to this public use; but third persons cannot shield their trespass under this claim. I may not dig up the highway in front of my house; but I may sue another, if he does. Besides, the society, or the public, may not wish to object to the plaintiffs' digging, if they do not interrupt the right of burial; or, they may even consent to that, if they will. A third person cannot set up a title in a stranger. *Shapleigh* v. *Pillsbury*, 1 *Greenl.* 290. *Phelps* v. *Yeomans*, 2 *Day*, 227. 3 *Wheat.* 226. n. *Collins* v. *Torry*, 7 *Johns. Rep.* 278. *Green* v. *Watkins*, 7 *Wheat.* 28. *Stanley* v. *Perley & al.* 5 *Greenl.* 372.

3. What is the effect of burying in this ground for sixty years or more? The question supposes, as the plaintiffs claimed, that there has been nothing done but burying the dead. If the letter is the measure of the grant, as was said by *Hosmer,* Ch. J. in the case of *Hart* v. *Chalker*, 5 *Conn. Rep.* 315, then it is clear, the use stated proves only a grant *to bury*, leaving the right of feeding, mowing and possessing in the former owners. Burying is but a momentary and very limited use, not inconsistent with the fee and occupation in the owner. The adverse power is limited. It is like flowing land, which has been held to be no act of disseisin;—like occupying for a highway. Now, such occupancy, though it be perpetual, does not imply a claim or a power of *universal dominion*. A limited right issuing out of land, is an easement; and the extent of the easement is not material, as whether land be constantly flowed or passed over, so long as the use is *specific* and *limited*. A right to bury, to flow, to pass, lie in grant, and pass without livery; so would a right to lay and continue a drain in another's land, or a perpetual right to go and take water from another's well. So of all incorporeal rights: none of them pass by livery; nor do they touch the freehold, but leave it as before their creation. Has not a turnpike company as much use of, and do they not assert as much dominion over, the land taken, as do persons burying in the land? *Dawney* v. *Dee &* al. *Cro. Jac.* 606. *Com. Dig. tit.* Cemetery. 1 *Chitt. Prac.* 50, 1, 2. 164, 5.

4. Can this vote operate to prevent a recovery by the plaintiffs? Not as a *grant*, or rather as a *deed of feoffment*; for, as an alienation, it must operate at once. The thing claimed to be parted with, *viz.* the fee, lies in livery, and passes only by

livery.   Hence, as a deed, it cannot operate as an alienation; for there was no grantee *in esse.*   And besides, it does not appear, that when this congregational society came into being, they were contemplated as the takers.   There was no deed; and the vote has never been recorded in the records of the town, so as to have the benefit of the late statute.   2 *Stat.* 73. (*May*, 1825.)   Besides, the vote of 1812, was by the town, and not by the proprietors or owners.

Can it operate by way of *dedication?*   In the first place, the suing of these defendants is not interfering with any privilege dedicated.   The grant was of *a right to bury:* the use has been *only burying.*   If the vote has any effect, it is by way of *estoppel* or *equitable bar;* but how can a *stranger* set up such a defence?   He is in no way affected, and cannot complain, do as we will.   The following cases were cited and commented on.   *Wilson* v. *Hunt,* 2 *Mass. Rep.* 500.   *Rice* v. *Osgood* & al. 9 *Mass. Rep.* 38. 43. *Brown* v. *Porter,* 10 *Mass. Rep.* 93.   *First Parish in Shapleigh* v. *Gilman,* 13 *Mass. Rep.* 190.   *Town of Shapleigh* v. *Pilsbury,* 1 *Greenl.* 271.   *Pawlet* v. *Clark,* 9 *Cranch* 292, 330, 331.   *McConnell* v. *Lexington,* 12 *Wheat.* 582.   *Beatty* & al. v. *Kurtz* & al. 2 *Pet.* 566.   *City of Cincinnati* v. *Lessee of White,* 6 *Pet.* 432.

All the cases present a *body* to whom the dedication is made. Here, there is none, unless it is *all* the inhabitants.

The counsel for the defendants remarked, in the first place, that it was no objection to the grant of 1712, that it was made in town meeting, and not in proprietors' meeting.   All such grants, made previously to the year 1723, were properly confirmed, by the act of that year, on the ground that the proprietors themselves, who constituted, at that early period, a main part of the population of the towns, had, by acting and voting with others, in such town meetings, consented and agreed, that the common lands might be disposed of in that manner, and ought therefore to be estopped and barred against all pretensions to the contrary.   *Stat.* 440. (ed. 1808.)

Secondly, it is objected, that the grant being made "to the inhabitants on the *East* side of the great river, for a burying place," without any other designation, must, inasmuch as those inhabitants were not then incorporated, fail, for want of a *gran-*

*tee* competent to take. To this we answer, that although it is undoubtedly true, in regard to private grants, that there must be a grantee *in esse,* as well as a grantor, yet a different rule has been adopted, and has received the sanction of the highest judicial tribunal in the *United States,* as applicable to all appropriations for *public use.* Judge *Thompson,* in giving the opinion of the supreme court, in the case of *Cincinnati* v. *White,* 6 *Peters* 436. declares, in accordance with the doctrine maintained by judge *Story,* in the case of *Pawlett* v. *Clark,* 9 *Cranch* 292. 330. " that this class of cases forms an exception to the rule applicable to private grants, and grows out of the necessity of the case ; and that in this class of cases, there may be instances contrary to the general rule, where the fee may remain in obeyance, until there is a grantee capable of taking, where the object and purpose of the grant look to a future grantee in whom the fee is to vest." In reference to the case, then, before the court, where it appeared, that on the original plan of the city of *Cincinnati,* made thirteen years before its incorporation, the proprietors had set apart the *locus in quo,* as a common, for the use and benefit of the town forever, (*p.* 433.) the same learned judge declared, that " the fee might be considered in obeyance, until a competent grantee appeared to receive it, which was as early as 1802, when the city was incorporated. And the common having then been taken under the charge and direction of the trustees, would be amply sufficient to show an *acceptance,* if that was necessary for securing the protection of the public right."

When it is considered, that by the universal usage in *Connecticut,* the charge and protection of the public burying grounds have, from time immemorial, been regarded as pertaining to the ecclesiastical societies within whose limits they are situated ;—that when the grant was made by the town of *Middletown,* " the inhabitants on the *East* side of the river" had already formed themselves into a society, by voluntary association, and were taking the ordinary steps preparatory to an incorporation ;—that two years afterwards, they were, by the same name, incorporated, by the General Assembly, and immediately thereafter took the *locus in quo* under their charge and direction as a burying ground, and continued, from year to year, for a long period of time, to appoint grave-diggers, &c., therefor ;—it would seem, that there could be little doubt, that

the object and purpose of the grant looked to the society, *when incorporated*, as the grantee in whom the fee was to vest. 6 *Peters* 436. It is analogous to the case stated by judge *Story*, in giving the opinion of the supreme court in *Pawlett* v. *Clark*, 9 *Cranch* 292. 330. of a grant of a *glebe*, prior to the erection and consecration of a church, which, he says, "would take effect, by the common law of *England*, as a dedication to the parochial church of *England to be established therein*." "*Before* such erection and consecration, the fee would be in obeyance; *afterwards*, on the induction of a parson, he and his successors would, by operation of law, and without further act, have taken the inheritance *jure ecclesiæ*." *Ib.*

If it were otherwise, and the exigencies of the case rendered it necessary, we might rely with confidence on the statute of 1702, for securing estates given to public and charitable uses, as amply sufficient to give validity to the grant; or, if needful, the facts stated in the case would warrant the presumption of a renewal of the grant after the incorporation of the society. There is no pretence that the original proprietors, or any persons under them, ever interfered with the society in their controul of this ground, or ever exercised any act of ownership whatever in regard to it, from the time of the original grant to the present period.

If, then, the society, when incorporated, were competent to take the title conferred by the grant of 1712, and did, in fact, by taking the *locus in quo* immediately under their charge and direction, manifest their acceptance of the grant, the next question presented under the first head is: "What title did they take?" Or in other words, what did the proprietors of the town of *Middletown grant*?

They granted "one acre of *land*, between, &c. for a burying place;" and appointed a committee to lay it out. It was not a grant of the right of burial,—of an easement, merely, in the land of the proprietors. It was the "*land*" itself, which they granted; using the very term best adapted to convey,— what we should naturally infer, from the purpose of their grant, they intended to convey,—the entire title to the land, in fee simple. Although they declared the purpose for which they made it, *viz.* "for a burying place," they did not deem it necessary to annex any words of *condition* to their grant. Words indicating the intention or purpose for which a grant is made,

Middlesex,
July, 1835.

Chatham
v.
Brainerd.

such as "*ea intentione*," "*ad faciendum*," or "*pro faciendo*," or "*ad propositum*," or other like words do not make an estate conditional. *Co. Litt.* 204. 2 *Dyer* 138.

And in this case, it was the less important, as the statute of 1702, then in force, provided, that lands given for public and charitable uses should forever remain and be continued to the uses for which they were given and granted. *Stat.* 433. (ed. 1808.)

If the preceding views are correct, the society composed of the inhabitants on the *East* side of *Connecticut* river, incorporated in 1714, acquired, by the grant, a title in fee simple to the burying ground lot.

2. Supposing the grant from the town to have been void, for want of a competent grantee, did the possession of the burying ground, *as a burying ground merely*, confer a title on the society, or only an easement?

There can be no doubt that the right of burial *may* be separated from the ownership of the soil, and, like the right of cutting turf, or wood, or of depositing stone or timber on the land of another, *may* be exercised as an *easement*, by an individual or a society. And if the owner of the soil was himself in possession, during the period in which these rights were exercised, nothing but an easement could ever be acquired. But if the owner is not in possession, and the acts done on the land, by the occupant, are of a kind such as would ordinarily be regarded as acts of ownership, and especially, if they are such as are incompatible with the use of the land for ordinary purposes, by the owner, it is believed, that there is no principle or decision, which limits the right by such occupancy, to a mere easement. It is sufficient to enable the possessor to acquire a title, that he occupies the land as his own, for such purposes as he chooses. And although he may have no occasion to use it but for a single purpose, if that is of such a character as is ordinarily indicative of ownership, his occupation for a sufficient length of time would be just as effectual in conferring a title, as if he had used it for every purpose whatever.

Were it otherwise, every title acquired by adverse possession, would be measured, by the precise mode in which the occupant had actually enjoyed it, notwithstanding he had used it as he pleased, without restraint or interference from the owner.

If there is any one mode of occupation that looks to per-

petuity more than any other ;—which is more utterly incon-sistent with the ordinary exercise of the rights of ownership by another ;—which, from its peculiar character, would seem to indicate a tenure of the soil, which inviolably secures it against the claims and intrusion of all other persons ; it is that which appropriates it for the graves and monuments of the dead. The feeling, which influenced the patriarch *Abraham*, when he purchased the field and the cave of *Machpelah* for a bury-ing place, was not peculiar to the age in which he lived. Though he was offered, by the children of *Heth*, the choice of *their* sepulchres for the burial of his dead, he could not be sa-tisfied to deposit the remains of the partner of his bosom in the sepulchre of *another*.   He paid his money for the land ; " and the field and the cave, and all the trees that were in the field, that were in all the borders round about, were *made sure* unto *Abraham* for a possession of a burying place."   " And after this, *Abraham* buried *Sarah*, his wife, in the cave of the field of *Machpelah*."

The same feeling has been cherished among all civilized nations.   And when we erect our memorials to perpetuate the recollection of the virtues of departed friends and relatives, we are solaced by the belief, that their bodies will rest undisturbed in their places of sepulture, until they are raised in glory.

When an ecclesiastical society, therefore, or other corporation to whom it pertains, appropriates land in its possession to the purposes of a burial place, it proclaims its title, by the exercise of the very highest act of ownership, it can possibly exert ; and as such an appropriation necessarily excludes every ordi-nary mode of enjoyment, if it were not, itself, considered as furnishing evidence of ownership, it would certainly present an anomalous case, in which a title by possession could never be acquired, though the original owner may have ceased for a century to assert his claims, or to interfere with the pos-session.

WILLIAMS, Ch. J.   The plaintiffs claim damages for tres-passes committed upon lands, over which are highways, in the town of *Chatham ;* of which lands, they say, they are the owners.   Their title rests upon a vote of the proprietors of the town of *Middletown*, passed on the 9th of *January*, 1786,

confirmed, by subsequent acts of the town of *Middletown*, and a resolution of the General Assembly.

The town of *Chatham* was incorporated in 1767; and the vote above referred to, released to said town all the right, title and interest of said proprietors in the common and undivided lands lying in said town of *Chatham*, for the purpose of highways, or to remain as common for the general use of the inhabitants of said town.

The defendants claim, that no title to the highways remained in the ancient proprietors of lands in the town of *Middletown;* of course, that no title passed to the plaintiffs, but that the freehold of the highways was in the owners of the adjoining lands; and that they only could maintain this action; and so were the jury instructed.

Was this charge correct? If it was, or if the plaintiffs acquired no title to the lands in question, by the grant of the proprietors, they cannot recover, unless they prove themselves adjoining proprietors. For the claim now made by the plaintiffs, that if the defendants show no title in themselves, or claim none, they can have no defence, cannot be acceded to, by the court. If the case of *Phelps* v. *Yeomans* can be supported upon no other ground, it cannot be law. As the reasons of the court are not given in the report, it is not exactly known upon what ground the judgment was given. But that a person can maintain an action for damages done to property to which he has no title, and of which he has not the possession, is contrary to the dictates of natural justice, as well as the principles of law.

It is said, the defendants are mere tort-feasors; and shall they set up the title of another, when they have no rights? If the defendants show the title of another, then they show that they are accountable to that other, and not to the plaintiffs. And as a recovery by these plaintiffs would be no bar to a recovery by the real owner, and could not even be given in evidence against the claim of such owner, it would be strange indeed if the defendants could not be permitted to show, that the plaintiffs had no interest whatever in the property which they claimed to be injured. No lawyer would contend, that a declaration in trespass, in which neither title nor possession was alleged to be in the plaintiff, would be sufficient. These then are material allegations, and must be proved; and if the plain-

*Middlesex,*
*July, 1835.*

Chatham
*v.*
Brainerd.

tiff must prove a title, it is not easy to comprehend why the defendant may not disprove it, if he can, or what rule of law would prevent his disputing a material fact alleged by the plaintiff. This objection being disposed of, the question arises, had the proprietors of the ancient town of *Middletown* any interest in these highways, at the time of the vote of *January* 9th, 1786?

The lands on which the trespasses were committed, were highways in existence long before that vote. And it was decided, long since, by this court, that the ancient proprietors of a town, having laid out land as a highway, and conveyed the adjoining lands as bounded on the highway, had no remaining right in that highway. *Stiles* v. *Curtiss,* 4 *Day* 329. It was also soon after decided, that when a highway was laid out under the statute, the adjoining proprietors could maintain trespass for an injury upon the highway in front of their land. *Peck* v. *Smith,* 1 *Conn. Rep.* 103.

Before these cases, this subject had been much agitated in this state. It was supposed, that the rights of the adjoining proprietors were, by these decisions, recognized and settled : a title to the highways was *prima facie,* at least, in them. So it was supposed, at the trial of this cause upon the circuit. A recent authority from *Massachusetts* questions the decision in *Peck* v. *Smith. Tyler* v. *Hammond,* 11 *Pick.* 194. 213, 14. But it is in accordance with the decisions in the state of *New-York. Cortelyou* v. *Van Brundt,* 2 *Johns. Rep.* 357. Judge *Kent* recognises the principle as that of the common law. "The law," says that eminent jurist, "with respect to public highways and fresh water rivers, is the same, and the analogy perfect, as concerns the right of soil. The owners of land on each side go to the centre of the road. The established inference of law is, that a conveyance of land bounded on a public highway, carries with it a fee to the centre of the road, as part and parcel of the grant. The idea of an intention in the grantor to withhold his interest in the road to the middle of it, after parting with all his right to the adjoining lands, is never to be presumed." "It would require an express declaration to sustain such an inference." 3 *Kent's Com.* 432, 3. Judge *Swift,* upon a review of the cases in his *Digest,* adheres strongly to his opinion. 1 *Swift's Dig.* 108. In the *Common Pleas* in *England,* since *Peck* v. *Smith, Gibbs,* Ch. J.

says, that "*prima facie* the presumption is, that a strip of **Middlesex,** land lying between the highway and the adjoining close, be- **July, 1835.** longs to the owner of the close ; as the presumption also is, that **Chatham** the highway itself *ad medium filum viae* does." *Grose* v. **Brainerd.** *West,* 7 *Taun.* 39.

It is said, that in the cases adjudged in this court, there was great diversity of opinion among the judges, and so this case is entitled to little weight. It is true, that upon some points arising in the case of *Peck* v. *Smith,* there was a great diversity of opinions. But amidst all the difference of opinion, no one of the judges held, that when a highway was laid out in the ordinary manner, the fee remained in the proprietors, not owners of the adjoining lands. In the case of *Peck* v. *Smith,* five of the judges held, that the fee of the highway was in the adjoining proprietors. *Reeve,* J. held, that these proprietors had a freehold interest subject to the easement, but that the ultimate fee was in the public. One judge gave no opinion ; and in *Stiles* v. *Curtiss, J. C. Smith,* J. gave a decided opinion, that the fee was in the adjoining proprietors ; and two judges held, that the fee was in the public. So that of nine judges, who have given opinions on this subject, seven held, that while the highway was continued, the freehold was in the adjoining proprietors ; and all agreed, that the original proprietors, as such, had no interest. So far, then, as regards the point now in controversy, this can hardly be called a divided opinion.

Without going over the argument upon the subject, or examining the cases cited in *Peck* v. *Smith* and *Stiles* v. *Curtiss,* we feel bound to regard those opinions ; and had the respectable opinions from *Massachusetts* led us to doubt upon this point, we should be very unwilling to disturb titles settled under the authority of those cases, or open again the flood-gates of litigation upon a subject, which so long agitated this community. And although we do not go so far as one of those judges, and hold, that the ownership of the adjoining lands on each side of the way, furnishes conclusive evidence that such owner has a fee in the highway, yet we do hold, that it furnishes *prima facie* evidence of that fact, and that strong testimony is necessary to rebut it. Such was the opinion of judge *Swift* in *Peck* v. *Smith.* And that land adjoining a highway or water-course, may be so conveyed as to exclude the highway or water-course,

*Middlesex,*
*July, 1835.*

Chatham
*v.*
Brainerd.

is admitted. Such were the cases of *Jackson* d. *Yates* & al. v. *Hathaway,* 15 *Johns. Rep.* 447. 452. *Watrous* v. *Southworth,* 5 *Conn. Rep.* 305. 310. *Headlam* v. *Hedley,* 1 *Holt's N. P. Ca.* 463. (3 *Serg. & Lowb.* 157.) The same principle seems to be recognised in more recent cases in *New-York. Case of Seventh Street,* 1 *Wend.* 262. 270. *Case of Lewis Street,* 2 *Wend.* 472.

Do the plaintiffs bring their case within this class? The plaintiffs are not adjoining proprietors, except of one piece on the *West* side of the highway; and as to that, the jury have found a license. The defendants are proprietors of the other piece on the *West* side of the highway; and third persons are proprietors of the lands adjoining the highway on the *East,* except the burying-ground, which requires a separate consideration.

But it is claimed, on the part of the plaintiffs, that the deeds themselves shew, that it was not intended to convey to the centre of the highway. In this motion, the deeds are not all given, by which the title is deduced; but enough are given to shew the questions raised upon the trial. On the *West* side, where the defendants' lot lies, the deed to *Benjamin Sutliff* describes the land as follows: " Beginning four rods *Westward* of the *South-West* corner of *Noah Smith's Goodale* lot, running *West* 26° *S.* four rods; then *West* 3° *N.* 15½ rods, to the river, at high-water mark; then *North* 26° *E.* 16½ rods; then *East* 3° *S.* 20 rods; then *South* 26° *W.* 14¾ rods, to the first station: Bounded *Westerly,* on the river; *Northerly,* on common land; *Easterly,* on highway or common land; *Southerly,* partly on land granted to *H. G.* &c., and partly on common land left for highway." This deed bounds the grantee *Easterly on the highway.* If this means the centre of the highway, it is incumbent on the plaintiffs to shew how that meaning is varied. This, they claim, they have done; and that a station is taken, or a starting point given, four rods from the *Goodale* lot, and the courses and distances given until they come back to that point; by following which, it is said, the highway will not be touched, unless it be to cross it. In answer to this, it may be asked, where is this station? Is its position shown with any accuracy? Are any facts disclosed upon this motion, by which the court can determine whether these courses and distances, if followed, would bound the lands

*Middlesex*,
July, 1835.

Chatham
*v.*
Brainerd.

conveyed upon the side of the highway or the centre of it? Or whether the lands would touch the highway at all? To rebut the proof arising from giving the highway as a boundary, the plaintiffs should have shown where these courses would have led, and what bounds were described by them.

But supposing these courses and distances would not reach to the centre of the highway, is there any thing upon the face of the deed, which shews an intention to exclude that part of the highway ;—any thing which shews, that these grantors, in the year 1786, when the fee of this land was worth but a trifling sum, intended to reserve to themselves a remainder in this little strip of land, after a highway should have been extinguished? Is there such evidence of it as is sufficient to vary the construction otherwise to be given to such instruments? On the one hand, a boundary is given, the legal import of which is well settled ; on the other, is a point to be ascertained by mensuration, and to be returned to, by courses and distances ; and these boundaries differ. There can be no doubt which are to govern, unless we overrule well settled principles of law, lately recognised in *Belden* v. *Seymour*, 8 *Conn. Rep.* 19. and in *Higley* v. *Bidwell*, 9 *Conn. Rep.* 447.

Suppose we apply the argument of the plaintiffs to the *Western* boundary, as well as the *Eastern*. These courses and distances may not, and probably do not, touch *Connecticut* river. Are the grantees under these deeds to be shut out from the waters of the river, and thus deprive their lots of much of their value? This can hardly be pretended. And if the courses and distances cannot vary the boundary on one side of these lands, they cannot on the other.

But it is said, these lands are bounded *Easterly* on highway *or common land ;* and shall the boundary be in one place, if it proves to be highway, and in another place, if it proves to be common land?

This argument is certainly ingenious ; but it is believed to be rather specious than solid. What was meant by the draftsman of this deed, by the expression "or common land?" It is conceded, there is no record of this highway. The evidence of its existence is prescriptive. When the original deeds were drawn, there was probably some doubt as to the existence of the highway. The words " or common land," were therefore introduced, and copied into the subsequent deeds, intending, as

may well be supposed, the same thing as is meant in the same deed, when, as to the *Southern* bounds, it speaks of " common land left for a highway." If this was the intention, it would not admit such a construction as is claimed on the part of the plaintiffs. And even if it was not, we do not see sufficient evidence to remove the presumption arising from the great fact, that the deeds give the highway as the *Eastern* boundary, if it is ascertained there is a highway there. It is not necessary to say what would have been the construction had this proved to be common land.

As to the deed on the *East* side from *Clay* to *Goodale*, it is said, there are only courses and distances given, and no boundary on the highway. It is to be observed, that this deed conveys only a small part of the land subsequently conveyed, by the deed to *Noah Smith*—only three roods—while the other conveys four acres, three roods and twenty-seven rods, and bounds him expressly on the highway. We see nothing, therefore, which ought to lead to a different result as to that part of the highway.

The next question is, whether the plaintiffs have title to the *burying ground ;* for the land in the highway in front of that ground, must be subject to the same rules as the residue of the highway.

The plaintiffs rest their claim to the fee of this ground upon the same conveyances under which they claimed the highways; and the court below was of opinion, that they gained title, by virtue of those conveyances, (there being no adverse possession) if any interest remained in the proprietors. On the part of the defendants, it was claimed, that those proprietors had no such interest ; first, because they had granted all their right to the first ecclesiastical society of *Chatham ;* secondly, because this society had acquired the title by possession. It was put to the jury on the question of possession. The plaintiffs claim, that the question which they wish to try, whether the right acquired by this possession was a mere easement or an absolute title, was not submitted to the jury. But if the society had an absolute title by grant, this question as to the effect of the possession, will be of no importance. The nature of that grant will be first considered.

It appears, that on the 13th day of *January*, 1712, the town of *Middletown* granted to the inhabitants on the *East*

side of the great river, one acre of land [describing it] *for a burying ground ;* and appointed a committee to locate it.

Two questions arise under this grant. Did it convey any title to this society ? And if it did, what was the nature of this title ?

No objection was made, on the trial, to this grant, that it was made in town meeting, and not in proprietors' meeting. Nor can such an objection prevail ; because by an ancient act of Assembly, passed in the year 1723, such grants were confirmed., as the proprietors of that early period constituted the great mass of the inhabitants qualified to vote at town meeting. But the claim was and is, that as the society was not then incorporated, there was no grantee who could take under that vote.

The defendants claimed, that the society was formed, by the voluntary association of the inhabitants of *Middletown*, residing on the *East* side of *Connecticut* river, in 1712, who, on their application, were, by that name and style, incorporated in 1714 ; and in connexion therewith, they exhibited the grant referred to, accompanied with proof, that the society immediately entered into possession of said ground, appointed a sexton and grave-digger, from year to year, to take care of it, and to bury therein ; and have ever since used the same exclusively, and erected monuments therein, and in 1791, fenced the same. It was also shown, that the town of *Chatham* was not incorporated until the year 1767.

The plaintiffs, on their part, did not deny the possession of the society ; for they also claimed to have proved, that the society had occupied and possessed said burying-ground, for the purpose of a burying-ground for their dead, and for no other purpose whatever.

The dispute, then, at the trial, was, not as to the possession by the society, but as to the nature of it.

The question then fairly arises, did the society, upon the facts then admitted and proved, take any thing under the grant of 1712? The object of this grant was, not to convey a quarry, but a place to be used as a repository for the dead ; not intended as a matter of profit, but designed to be devoted to a very different purpose. It was, in short, a grant for pious and charitable uses. Transfers for such objects have been considered as standing upon very different grounds from that of ordinary con-

veyances. The supreme court of the *United States* have often been called to consider the effect of such transfers, and have uniformly holden them good, although at the time no grantee was *in esse.* Thus, in the case of the town of *Pawlet* v. *Clark* & al. 9 *Cranch* 292. 331., where one share of the town lands was reserved for a glebe for the *church of England* as by law established, the court said, that grants of this kind to pious uses, where there was no corporation in existence that could take, at the time of the grant, were an exception to the general rule, that there must be a person *in esse* capable of taking; that by virtue of the grant, the estate passed out of the donor and remained in obeyance; and that the property was dedicated to the designated use, just as a highway is dedicated to public use. It is said, that, as in this case, judgment was given for the plaintiffs, it was not necessary to decide this question; but the great object of the parties was, to ascertain the rights of the parties under that grant; and the court, in pursuance of a course of practice in that court, gave an opinion calculated to terminate the controversy upon the great point which had been litigated between them, although the particular case might have been decided without an opinion upon that point.

A similar question arose in the case of *Beatty* & al. v. *Kurtz* & al. 2 *Pet.* 566. 584. There, in laying out a town, a lot of ground was designated as, " for the *Lutheran* church," and had long been used, by the *German Lutherans*, for a buryingground and a place of worship; and the plaintiffs, further, had avowed that it was appropriated for the *Lutherans*, and that they were entitled to it. After the death of the father, his son, the plaintiff, entered upon and claimed this land; and the members of the society, who had never been incorporated, brought a bill for an injunction; and it was supported as a dedication of the lot to *pious uses ;* and the court, after reviewing and confirming the opinion given in *Pawlet* v. *Clark*, say : " It was originally consecrated for a religious purpose, and has become a repository for the dead; and it cannot be resumed, by the heirs of *C. Beattie.*" It was said, that this, being in chancery, proceeded upon the ground that the legal title had not passed. To this it may be observed, that the society was not incorporated when the suit was brought; of course, could not claim a legal interest. Had it been otherwise, however, it would not

Middlesex,
July, 1835.

Chatham
v.
Brainerd.

follow, that application might not probably have been made to a court of chancery to prevent the dilapidation of monuments, &c., for which no pecuniary compensation could be a satisfaction.

Again, more recently, this subject was presented to that court, in the case of *The city of Cincinnati* v. *Lessee of White*, 6 *Pet.* 432. 436. The original proprietors, while they had only an equitable interest in the property, set apart certain lands as a common, for the use of the town forever. After they acquired the legal estate, the original owners, or their assigns, brought ejectment for this land; and the court held, that they could not recover. *Thompson*, J. in delivering the opinion of the court, says, that appropriations of this kind were exceptions to the general rule requiring grantees; and in this class of cases, there may be instances contrary to the general rule, where the fee may be in abeyance until there is a grantee capable of taking it; where the object and purposes of the appropriation look to a future grantee in whom the fee is to vest. The case of *Beatty* v. *Kurtz* did not, says the judge, turn upon the bill of rights of the state of *Maryland*, or the stat. of *Eliz* relating to charitable uses, but rested upon more general principles. Other remarks were made peculiarly applicable to this case. "The fact of dedication is not left to inference from the circumstance that the land had been enjoyed as a common for many years; but the actual appropriation for that purpose, is established, by the most positive evidence." "And the fee might be considered as in abeyance until a competent grantee appeared to receive it, which was as early as 1802, when the city was incorporated. And the common having been taken under the charge and direction of the trustees, would be amply sufficient to show an acceptance, if that was necessary for securing the protection of the public rights." 6 *Pet.* 439.

In this case, as in that, the fact of dedication for public use, is not a matter of inference. It appears upon the records of the town of *Middletown* more than a century ago; and it also appears, that upon the petition of the inhabitants of *Middletown, East* side of the great river, this society was soon after incorporated; and immediately entered into possession, more than half a century before the town of *Chatham* was incorporated; and has ever since used it, for the purposes mentioned in the grant. If in the *Cincinnati* case, the fee might re-

*Middlesex,
July, 1835.*

Chatham
*v.*
Brainerd.

main in abeyance from 1789 to 1802, it surely might, in this case, remain in abeyance from 1711–12 to 1714. And if the acts of the trustees of that city from 1802 to 1832 constituted an acceptance, the occupation, by the society, of this burying-ground, for 120 years, would be at least equally sufficient.

So far then as the opinion of the supreme court is an authority, this question is settled; and although this is not an opinion upon constitutional law, obligatory upon this court, yet the opinions of the judges composing that court, in all cases, are entitled to our greatest confidence and respect. And upon a question of this kind, it would be with great reluctance we should depart from their decision, as it would be peculiarly unfortunate, that upon a question of title to real estate, different rules of construction should be adopted, by two courts, both of whom may have to decide, not only similar questions, but the same questions in different cases upon the same instrument.

The plaintiffs have failed to satisfy this court, that it is necessary to adopt a different construction. So far from it, we think it is only carrying into effect the provisions of our ancient statute, that estates granted for the maintenance of the ministry of the gospel, or schools of learning, or for the relief of the poor, or for any other public and charitable uses, shall forever remain and be continued to the uses to which they have been or shall be granted, according to the true intent and meaning of the grantor, and to no other use whatever.

Whether the fee remains in abeyance until the grantee comes into *esse,* according to the opinion of the supreme court of the *United States,* or whether it continues with the grantor until that time, as is held by the late learned Chief Justice of *Maine,* in the case of *Shapleigh* v. *Pilsbury,* 1 *Greenl.* 280., it is not necessary for us to determine; as either construction would, in this case, have precisely the same effect. But we are satisfied, that the appropriation of 1712 did look to a future grantee, in whom the fee was to vest; and that upon the incorporation of the inhabitants on the *East* side of the great river, and their taking possession of the premises, for the purpose expressed in the grant, the grant became operative, according to the true intent and meaning of the grantors.

The *effect* of the grant being settled, the next inquiry is, as to its *extent :* does it convey a fee, or only an easement ?—the soil itself, or only the right of burial in that soil ?

That a right of burial may exist in one person, or one set of persons, while the fee of the land is in another, is a proposition too plain to have required the numerous authorities cited to prove it ; and that such easements are not uncommon in *Great-Britain*, cannot be denied ; but when we recollect the situation of this country, at the commencement of the last century, and the then prevailing idea in relation to the tenure of land, it is very improbable, that this artificial course would have been taken here. The most of our lands were forests, owned by the original proprietors of the towns in which they were located, who divided and allotted them among each other, as their necessities required.

In the early settlements, if an individual wanted to build, he made it known to the town ; and a quantity of land was allotted to him, and a committee appointed to locate it ; and if a school-house or meeting-house lot was wanted, similar proceedings were had. Surely, in such cases, it was not intended merely to convey the use of the land, and leave the reversion in the original proprietors. Estates other than allodial were, at that time, hardly known, in our state ; and incorporeal hereditaments were seldom heard of ; and the land was of too little value to subdivide the interest in such a manner. Nor is there any thing in the terms of the vote, by which this grant was made, which shews, that it was intended to create an easement. It is a grant of one acre of land for a burying-place. It was the land, which was granted, though the object was designated. It was a grant of the same kind as one to *J. S.*, to erect a dwelling-house upon. It is not a grant of a mere right to bury, but a grant of the land for that purpose. " The word *land*, comprehends any ground, soil or earth whatsoever." *Co. Litt.* 4. And by a grant of " all his woods, pastures, meadows,", the soil itself passes. *Ib.* By the word *ground*, the soil generally passes ; and as deeds are to be construed most strongly against the grantor, then he who means to limit a technical meaning, must qualify general words thus used by him. Thus, where " sea-grounds, oyster-layings, shores and fisheries," were granted, with liberty to fish, &c., it was held a grant of the soil. *Scratton* v. *Brown,* 4 *Barn. & Cres.* 485. (10 *Serg. & Lowb.* 385.)

It was said in argument, that the supreme court, in some of the cases cited, considered the rights acquired under those

grants as mere servitudes or easements. It is true, that expressions of that import are used; but no question as to the nature of the interest had been raised or discussed, in those cases. These expressions, therefore, cannot be considered as intended to convey the settled opinion of the court. However that may be, in this case, the words of the grant, the small value of land, and the then existing notions as to titles, concur in inducing the belief, that the grantors intended what the words of the vote indicate,—a transfer of the whole interest in this land.

Whether a base fee was thus created, as was claimed by one of the defendants' counsel, or what consequences will result from a desecration of this ground, by the society, are questions which were not presented at the trial below, and cannot be important as it respects the rights of the parties now before the court. They may never arise. At all events, the court are not disposed to anticipate them. It is enough for us to say, that as no right remained in the original proprietors to this burying-ground, the plaintiffs could acquire none; and therefore, cannot claim any interest in the adjoining highway.

The view taken of the plaintiffs' title makes it unnecessary to examine several questions presented upon the motion and discussed at the bar.

As the plaintiffs have failed to establish their title to the premises, they can have no claim to damages. The verdict, therefore, is right; and there can be no new trial.

The other Judges were of the same opinion.

New trial not to be granted.